Ernest E. MASTROIANNI, Plaintiff,

v.

Edward REILLY, James Neal and Dr. Minetti, Defendants.

No. 02CV0846 (ADS)(ETB).

United States District Court, E.D. New York.

March 7, 2009.

Anthony J. Colleluori, Esq., Woodbury, NY, for the Plaintiff.

Office of the County Attorney of Nassau County, by Deputy County Attorney Catherine N. Gray, Mineola, NY, for the Defendants Edward Reilly and Dr. Minetti.

Troy & Troy, by Alexander V. Sansone, Esq., of Counsel, Centereach, NY, for the Defendant James Neal.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The plaintiff Ernest Mastroianni (Mastroianni or the "Plaintiff"), an inmate at the Nassau County Correctional Center ("NCCC") commenced this action *pro se* pursuant to 42 U.S.C. § 1983 *pro se* against the Nassau County Sheriff Edward Reilly ("Reilly"), the NCCC Medical Director James Neal ("Neal"), and the NCCC Director of Psychiatry Dr. Minetti ("Dr. Minetti") (collectively, the "defendants"), alleging a violation of his Fifth, Eighth, and Fourteenth Amendment rights. On January 21, 2003, Anthony

Colleluori was appointed by the Court to represent the Plaintiff in this action.

On October 24, 2002, United States Magistrate Judge E. Thomas Boyle directed the parties to show cause, in writing, as to whether the plaintiff's action should be dismissed for failure to exhaust available administrative remedies prior to commencing this action. On May 28, 2003, Judge Boyle held an evidentiary hearing with respect to this issue. The plaintiff was represented by counsel at the hearing. Thereafter, on August 12, 2003, Judge Boyle issued a Report and Recommendation (the "Report") recommending that this action be dismissed on the grounds that the plaintiff failed to exhaust his administrative remedies prior to initiating this action. On September 30, 2005, the plaintiff's objections to Judge Boyle's Report and Recommendation were sustained, the plaintiff's claims were deemed exhausted, and the action proceeded to discovery.

This case was administratively closed until April 30, 2007 due to the plaintiff's incarceration in an out-of-state federal facility and was restored to the active calendar on August 11, 2007. The complaint as filed contained no demand for relief, but was commenced while the plaintiff was an inmate at the NCCC and complains of the conditions the plaintiff experiencing at that time. However, as the plaintiff is no longer an inmate at the NCCC, any request for injunctive relief has been mooted by his release. Accordingly, the Court construes the complaint as seeking monetary relief for violation of the plaintiff's Eighth Amendment rights. Now, the defendants move for summary judgment pursuant to Fed.R.Civ.P. 56, dismissing the complaint.

## I. BACKGROUND

The plaintiff's complaint alleges that from the time he was incarcerated on February 6, 2001 up until the filing of the complaint in the instant action on January 25, 2002, he had been denied proper medical treatment for his many health conditions amounting to deliberate indifference to his medical needs. The plaintiff contends that at the time of his incarceration, the NCCC staff was aware that the plaintiff was prescribed medications to treat hypertension, anxiety and depression, hypercholesterolemia, and cardiovascular disease. In addition, the plaintiff contends that prior to his incarceration, he suffered two cardiac related incidents for which he twice underwent arterial stent implantation at Winthrop University Hospital.

The complaint includes allegations that while the plaintiff was incarcerated (1) his blood pressure was not being controlled; (2) he never visited a medical doctor for an examination; (3) his requests for an echo stress test were repeatedly denied; (4) he did not receive a sonogram to determine the severity of a kidney stone condition; (5) he was denied an operation and proper bedding to correct a back injury sustained while incarcerated; and (6) he was denied medication and a proper diet for his medical conditions. The complaint also alleged that the defendants failed to "properly train and supervise subordinates to recognize and properly treat [his] serious medical conditions in the correct and proper timely fashion."

The plaintiff contends that on approximately 150 occasions from December 2001 through May of 2003, after the filing of the instant action, he was not administered his prescribed medications and, on at least 50 occasions, the defendants failed to provide him with both of his anti-hypertensive medications, Lopressor and Lotensin. The plaintiff alleges that due to a custom of ignoring his basic medical needs, including a request for cardiac testing, on or about May 10, 2002, he suffered an "acute coronary syndrome," which caused him to

fall down a flight of stairs and suffer a severe trauma to his back. Further, the plaintiff contends that he developed diabetes while in the NCCC as a result of the defendants' refusal to provide him with a low-starch diet. Finally, the plaintiff contends that he was tormented by corrections officers who taunted and intimidated the plaintiff when he asked to be seen by medical staff at the facility. The plaintiff states that this abuse, together with the anxiety he experienced from not receiving his necessary medications strained his mental health.

With respect to his attempts to exhaust the administrative remedies at the NCCC, the complaint indicates that the plaintiff "placed numerous [g]rievances, and numerous times [he] had been seen and the problem still was not [rectified]." In addition, the plaintiff alleges that as the result of an informal grievance policy at the facility "nothing was accomplished [and that] the problem is getting worse." The plaintiff contends that the relatively few formal grievances in evidence do not accurately represent the complaints he made to NCCC staff because the existence of the informal grievance policy prevented him from filing formal grievances.

In particular, the plaintiff contends that due to the implementation of the "Supervisor's Intervention Form" in 2001, inmates were required to request grievance forms up to three times and had to engage in informal discussions with corrections staff before a formal grievance would be furnished to the requestor and transmitted to Lt. Williams, the Inmate Grievance Coordinator. The plaintiff states that his rate of success in obtaining an actual grievance form on request was only one in fifty. In addition, the plaintiff states that in response to his many "informal" complaints, the corrections and medical staff would either threaten the plaintiff if he persisted

to seek relief or promise to resolve the issue and fail to deliver.

The defendants paint a very different picture with regard to the treatment received by the plaintiff during his time at the NCCC. The defendants contend that the plaintiff received regular medical attention and was treated for various medical conditions, including regular mental health treatment; medications for his heart condition; transport to the Nassau County Medical Center after his fall on May 10, 2002; sonogram tests to evaluate his kidney stones; sick call appointments; and regular testing and medication for diabetes.

Further, while the defendants concede that the plaintiff missed some medication doses, they contend that this occurred on a very limited basis as is evidenced by the formal grievances in the record. However, the plaintiff counters that due to the policy of withholding grievance forms from inmates, the actual number of missed medication doses was much greater.

## II. DISCUSSION

Summary judgment is proper only where no genuine issue of material fact exists to present to the trier of fact. Rule 56 of the Federal Rules of Civil Procedure states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

A motion for summary judgment should be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a

matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party bears the burden of establishing the absence of a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has offered evidence that no genuine issue of material fact remains, the burden shifts to the non-moving party to provide evidence that a genuine, triable issue remains. *Id.* at 250, 106 S.Ct. 2505. It is well-settled that the non-moving party cannot defeat summary judgment with unsupported assertions or the allegations in its pleadings. Fed.R.Civ.P. 56(e); *Cifarelli v. Vill. of Babylon,* 93 F.3d 47, 51 (2d Cir.1996); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).

In deciding a motion for summary judgment, the Court must view all of the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, 91 L.Ed.2d 202; *Vann v. City of N.Y.,* 72 F.3d 1040, 1048–49 (2d Cir.1995). Notably, "the trial court's task at the summary judgment motion stage of litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs. Ltd.,* 22 F.3d 1219, 1224 (2d Cir. 1994); *see Donahue v. Windsor Locks Board of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987) (holding that on a motion for summary judgment, the court "cannot try issues of fact; it can only determine whether there are issues to be tried").

The defendants contend that because the plaintiff failed to file a counter-statement of facts pursuant to Local Civil Rule 56.1, the facts set forth in their joint 56.1 statement must be deemed admitted. Indeed, Local Civil Rule 56.1(c) provides that *"[e]ach numbered paragraph in the statement of* material facts ... will be deemed to be admitted for purposes of the motion unless *specifically* controverted by *a correspondingly numbered paragraph in* the statement required to be served by the opposing party." Accordingly, the defendants assert that the plaintiff concedes the following facts relevant to this motion: (a) that there is a sick call procedure at NCCC; (b) that he participated in sick call many times; (c) that he does not know the time frame in which he missed his medications; and (d) that he had no contact with defendant Neal.

■■■■ The Second Circuit has made clear that "while a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (internal quotations and citations omitted). In addition, the opposing party's failure to comply with Local Rule 56.1 "does not absolve the party seeking summary judgment of [the] burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 Statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003) (quoting *Holtz,* 258 F.3d at 74) Accordingly, " '[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is

presented.'" *Holtz*, 258 F.3d at 74 n. 1 (quoting Fed.R.Civ.P. 56(e), Advisory Committee Note to 1963 Amendment).

Important to this motion, although the plaintiff conceded at deposition that he does not know the time frame in which he did not receive his medication, he also testified that his medication was never received on a daily basis and that on occasion, he would go without some medications for up to ten days. (Tr. Dep. at 85:17–86:3 [1]). Thus, the Court will consider the defendant's motion in two parts (1) whether the plaintiff has adduced sufficient evidence to proceed with a claim of deliberate medical indifference; and (2) against whom that claim may proceed.

### A. Deliberate Indifference to Serious Medical Needs

▮ Deliberate indifference to a serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998) (*quoting Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). "[A]n Eighth Amendment deliberate indifference claim is not valid unless it meets certain objective and subjective criteria." *Bellotto v. County of Orange*, 248 Fed.Appx. 232, 236 (2d Cir.2007). The objective prong looks to the severity of the alleged deprivation while the subjective prong asks whether the prison official acted with a sufficiently culpable state of mind. *See Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir.2003). A prisoner must show more than "an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability." *Id.* at 184.

▮ The objective prong is satisfied when "(a) the prisoner was actually deprived of adequate medical care, meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) the inadequacy in medical care is sufficiently serious." *Bellotto*, 248 Fed.Appx. at 236 (internal quotations and citations omitted). When an inmate alleges denial of adequate medical care, the court must evaluate the seriousness of the prisoner's medical condition. *Id.* While there is no "precise metric" by which to measure the severity of the prisoner's condition, the standard "contemplates a condition of urgency that may result in degeneration or extreme pain" and "actual medical consequences are highly relevant." *Id.* (internal quotations and citations omitted).

On the other hand, when a prisoner alleges an interruption of otherwise adequate medical services, the Second Circuit focuses "on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.* (internal quotations and citations omitted).

▮ The subjective prong of the two step analysis requires personal involvement of the prison official and is met where an "official knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Although the prisoner is not required to establish that the official acted "for the very purpose of causing harm or with knowledge that harm will result," he must establish that "the official was aware of facts from

---

**1.** "Tr. Dep." refers to the transcript of the deposition of Ernest E. Mastroianni, conduct- ed on June 21, 2007 and July 20, 2007.

which one could infer that a substantial risk of serious harm exists, and that the official drew that inference." *Bellotto,* 248 Fed.Appx. at 237 (internal quotations and citations omitted). In other words, an official acts with deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety." *Smith,* 316 F.3d at 184 (internal quotations and citation omitted).

The plaintiff has alleged several deficiencies in the care he received while resident at the NCCC. The Court addresses each in turn.

### 1. *Treatment by the psychiatry department and Dr. Minetti*

■ At the outset, the Court notes that it is undisputed that Dr. Minetti, the Director of Psychiatry was not served with process in this action and therefore the Court does not have personal jurisdiction over him. *Fed. Deposit Ins. Corp. v. O'Connor,* No. 94CV4218, 2008 WL 88294, at *1 (S.D.N.Y. Jan. 3, 2008) (" 'Valid service of process is a prerequisite to a district court's assertion of personal jurisdiction over a defendant.' ") (quoting *AICPA v. Affinity Card,* 8 F.Supp.2d 372, 375 (S.D.N.Y.1998)). Further, the Court notes that the plaintiff fails to substantively address the issue of his treatment by Dr. Minetti in his opposition to the defendants' motion. However, to complete the record, because the plaintiff's claims against Dr. Minetti also fail the Eighth Amendment analysis, the Court grants summary judgment as to those claims.

The plaintiff testified at deposition that he was seen by someone in the mental health department, including Dr. Minetti, on a regular basis, (Tr. Dep. at 195:18–24, 197:17–22); that when he saw Dr. Minetti, he examined the plaintiff and discussed his problems (Tr. at 199:7–10); that his medications were changed during the course of

his treatment as a result of meeting with practitioners in the mental health department (Tr. Dep. at 196:5–10); that on one occasion he complained to Dr. Minetti about his medication being discontinued and Dr. Minetti reacted appropriately and got it reinstated (Tr. Dep. at 198:9–24).

Further, the plaintiff states that he had not seen a mental health professional prior to placement in the NCCC and has not seen one since his release from prison. (Tr. Dep. at 38:9–20). Accordingly, the plaintiff's treatment by Dr. Minetti and the mental health group did not pose any particular risk of harm or result in actual adverse consequences to the plaintiff. Summary judgment is granted dismissing the complaint against Dr. Minetti.

### 2. *Treatment of the plaintiff's kidney stone condition*

■ The plaintiff's complaint states that he was diagnosed with large clusters of kidney stones, which were very painful and caused the presence of blood in his urine. The plaintiff testified that he had a history of developing kidney stones, for which he had undergone operations in the past, and while he was at NCCC, the condition returned. (Tr. Dep. at 166–167). At the onset of symptoms, the plaintiff filled out a sick call form and was brought to the medical department, where he was given a urine test and instructed to drink water. (Tr. Dep. at 168:22–169:25). He returned to medical approximately every three days during this episode and was prescribed Motrin for the pain. (Tr. Dep. at 170:8–23). In addition, the plaintiff was given a sonogram test and passed the stone naturally without surgical intervention. (Tr. Dep. at 172:3–173:11). However, notwithstanding the above treatments, the plaintiff contends that the medical staff could have done more to treat his kidney stone problem.

 Importantly, a prisoner's "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703; *see also Estelle,* 429 U.S. at 107, 97 S.Ct. 285 ("[T]he question of whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice"); *Tindal v. Goord,* 530 F.Supp.2d 465, 467 (W.D.N.Y.2008) (granting summary judgment in favor of the defendant where the plaintiff received regular medical attention in response to his complaints that he had an STD and underwent a battery of tests); *Torres v. Trombly,* 421 F.Supp.2d 527, 531 (D.Conn.2006) ("[M]ere disagreement with prison officials about what constitutes appropriate medical care does not state a claim cognizable under the Eighth Amendment.").

The Court finds that the plaintiff has raised no genuine issue of material fact with respect to the treatment he received for his kidney stone condition. By plaintiff's own testimony, it is clear that while he may have disagreed with the course of treatment he received, he got regular medical attention for the condition and underwent the necessary diagnostic tests.

### 3. The plaintiff's back injury

 The plaintiff's complaint alleges that he suffered a back injury as a result of the fall down the dormitory stairs on May 10, 2002 and was denied proper treatment of the injury, including an operation, better bedding, and adequate pain medication. The plaintiff testified that he was diagnosed with herniated disks following the fall. (Tr. Dep. at 133:4–16). Immediately following the accident, the plaintiff was taken to the hospital and sometime thereafter, he was given an MRI as a result of continuing back pain. (Tr. Dep. at 133:17–24). The Court notes that this is not the kind of absence of care that evinces wanton disregard of his needs. Even after the plaintiff left the NCCC, the treatment recommended by a specialist was stretching and exercise, which the plaintiff states was helpful to the condition. (Tr. Dep. at 135:9–136:2). Accordingly, summary judgment dismissing this claim is appropriate.

### 4. The plaintiff's diet and diabetic condition

 The plaintiff further alleges that he developed diabetes as a result of the high starch diet he received at the NCCC and, even after a special diet was prescribed, it was not consistently provided by the facility. The plaintiff testified that prior to his incarceration, his physicians advised him to observe a low-salt, low-fat diet. (Tr. Dep. at 60:8–19, 109–110). However, the plaintiff stated that he did not recall his physicians advising him that starches and sugars could increase his blood sugar. (Tr. Dep. at 110:19–25). When the plaintiff complained about the food he was receiving and requested a low cholesterol diet, his request was fulfilled. (Tr. Dep. at 116:1–14). Upon discovery of the plaintiff's elevated blood sugar levels, he was placed on a diabetic diet, got daily blood glucose tests, and was prescribed diabetic medications. (Tr. Dep. at 120:15–121:5, 175:20–177:23).

As the plaintiff was not a known diabetic or glucose intolerant, and was not a particular risk for the development of diabetes, the failure to alter his diet simply cannot be deliberate indifference to a known or

obvious risk. Upon discovery of his elevated blood sugar levels, the medical staff responded by appropriately altering his diet. Whether or not the medical staff should have identified the plaintiff as a diabetes risk raises a question of medical malpractice, rather than any constitutional concern.

In addition, the Court finds that the plaintiff fails to raise an issue of fact concerning whether the defendants displayed deliberate indifference to his medical needs by failing to ensure that the plaintiff received his special diet at all times. In part, the plaintiff contends that even after he was placed on a diabetic diet, it was not delivered consistently. (Tr. Dep. at 181:23–182:19). However, the plaintiff also described the process whereby NCCC staff attempted to remedy failure to provide a specially prescribed diet:

Q. So on those days when—there were days that you did not get the diet you thought you were supposed to get.

A. Yes.

Q. When that happened, what would you do?

A. You could go tell the corporal or the officer in charge of the food cart that you didn't get your diet. He would try to call the kitchen why you didn't get your diet, and they would try to get you the diet.

(Tr. Dep. at 117:3–23). Further, the plaintiff stated that on approximately three occasions, he wrote to the facility dietician complaining about the diet he was receiving and she verified that he was signed up for the correct diet. (Tr. Dep. at 214:2–16).

■ The Eighth Amendment's protections against cruel and unusual punishment extends to the food provided to inmates, but requires only that "prisoners be given nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Liggins v. Parker,* No. 04CV0966, 2007 WL 2815630, at *18 (N.D.N.Y. Sept. 25, 2007). Based on the record, the Court finds that the diet provided to the plaintiff did not pose an imminent danger to his health and the responsiveness of NCCC staff to the plaintiff's dietary needs raises no constitutional concerns with respect to his health needs.

### 5. *The plaintiff's requests for cardiac testing*

■ The plaintiff also alleges that he received inadequate testing for his heart condition prior to the acute cardiac event that took place on May 10, 2002, despite his repeated requests and exhibited symptoms. The plaintiff testified that he experienced chest pain, shortness of breadth, and tiredness on a regular basis, and he made a request for a stress echo test in 2001 because he recognized that the symptoms were getting worse. (Tr. Dep. at 126–27). The plaintiff stated that the only time he was given a stress test was as a follow-up after the cardiac event, which required implantation of a stent. (Tr. Dep. at 129:9–24).

The defendants have not offered and the record is devoid of *any* test that was performed in response to the plaintiff's repeated complaints of worsening heart symptoms. Although the decision not to order an X-ray or like procedure is considered at most medical malpractice, *Estelle,* 429 U.S. at 107, 97 S.Ct. 285, where, as here, a particular test could mean the difference between life and death for a person in acute cardiac distress, the ramifications are quite different. The Court finds that the absence of any test, combined with the plaintiff's complaints of worsening

symptoms and his personal history present a genuine issue as to whether the medical staff disregarded a serious risk of harm to the plaintiff.

### 6. *The plaintiff's missed medication doses*

■ Finally, the plaintiff contends that his blood pressure was not well-controlled because the medical staff frequently failed to provide him with some, and at times, all of his prescribed medications. The defendants concede that the plaintiff missed medication doses, but insist that based upon the formal grievances in evidence, this occurred on a very limited, or isolated, basis. In stark contrast, the plaintiff contends that he missed approximately 150 doses of medication, frequently those prescribed to treat his heart disease. Further, the plaintiff contends that the documented number of complaints does not adequately reflect the instances that his medication was unavailable because the NCCC's informal grievance resolution procedure created great obstacles for inmates to make formal, written complaints.

■ At the outset, the Court notes that the parties devote much time arguing the propriety of the informal grievance procedure in place at the NCCC from August 2001 to April 2003. The plaintiff contends that the informal grievance policy failed to meet the minimum standards established by the New York State Commission of Corrections. However, the grievance procedure or lack thereof cannot itself form the basis of a Section 1983 claim because there is no constitutional right to a grievance mechanism. *Swift v. Tweddell*, 582 F.Supp.2d 437, 445–46 (W.D.N.Y. Oct. 17, 2008) ("It is well established ... that inmate griev-

ances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim."); *Shell v. Brzezniak*, 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." (citations omitted)). Instead, the material issue that arises from the plaintiff's difficulty in obtaining formal grievance forms is what result, if any, the policy had on the actual number of missed doses that were reported.

The plaintiff testified that he did not know the exact time frame of the missed doses, but also stated that his medications were never delivered on a daily basis and at times, he would go with certain medications for up to ten days or more. (Tr. Dep. at 85:17–20, 88:19–22; 95:13–22) (stating that at times, he did not get any of his medications). Further, the formal grievances that he did submit do refer to other instances of missed doses. (Def's. Exhs. D–2; D–4 (complaining that he was without pain medication for three days); D–5 (noting that he had not received medication for six days and stating that this was a recurring problem)). Finally, at the hearing held before Judge Boyle on the issue of exhaustion, the plaintiff stated that in a two year period, he missed more than 150 doses of medication, (Tr. Hearing at 117–18 [2]). The Court finds the frequency of missed doses to be an issue of fact for trial.

---

**2.** "Tr. Hearing" refers to the evidentiary hearing before United Magistrate Judge E. Thom-

as Boyle, on May 28, 2003.

If the plaintiff's estimation is deemed credible, denying an individual with known high blood pressure, a heart condition, and diabetes up to 150 doses of medication in a two year period could rise to a constitutional level of neglect. Frequently missed doses could readily result in adverse medical events. *See Koehl v. Dalsheim,* 85 F.3d 86 (2d Cir.1996) (continuing failure to provide plaintiff with eyeglasses to avoid double vision and the loss of depth perception that resulted from a prior head injury amounted to a violation of his Eighth Amendment rights as "[s]uch visual deficiencies can readily cause a person to fall or walk into objects ...."); *cf. Bellotto,* 248 Fed.Appx. at 237 (finding that missed doses of medication did not rise to a constitutional level because the only medical consequence that the plaintiff alleged was an anxiety attack); *Smith,* 316 F.3d at 188–89 (finding no constitutional violation because of two alleged episodes of missed HIV medication where plaintiff failed to present evidence of permanent or on-going harm or an unreasonable risk of future harm stemming from missed doses); *Bumpus v. Canfield,* 495 F.Supp.2d 316 (W.D.N.Y. July 20, 2007) (finding insufficient to establish a constitutional wrong one occasion where the plaintiff's hypertension medication was not refilled for several days).

The defendants contend that because the plaintiff's condition continued to worsen and he developed arterial blockages even under the care of his own physician prior to his incarceration, he cannot show that his additional cardiac problems resulted from the treatment experienced at the NCCC and were anything more than the natural course of his disease. However, a reasonable jury could determine that missing medication doses on a long ongoing regular basis caused the deterioration of the plaintiff's health or posed an unreasonable future risk of harm.

**B. *As to The Plaintiff's Claims Against the Individual Defendants***

As noted above, to establish indifference amounting to a constitutional violation, the "plaintiff must prove that the defendants had a culpable state of mind...." *Bumpus,* 495 F.Supp.2d at 321. Further, to establish a claim under § 1983, the plaintiff must show the personal involvement of each defendant.

The defendants contend that the plaintiff cannot state a cause of action against Sheriff Edward Reilly or Dr. James Neal in their individual capacities because he has failed to provide evidence of their personal involvement in his care and treatment at the NCCC. In particular, the defendants contends that Sheriff Reilly was not personally involved in the treatment of the plaintiff and that he was entitled to defer to the medical expertise provided by the Nassau Health Care Corporation regarding the treatment of inmates. Further, the defendants contend that Dr. Neal did not treat or render care to the plaintiff.

"[A] supervisory official may be personally liable if he or she has actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1066 (2d Cir.1989) (internal quotations and citations omitted). "Personal involvement of a supervisory official within the meaning of § 1983 may be established through: (1) direct participation in a constitutional wrong; (2) failure to remedy a known wrong; (3) creation of an unconstitutional practice or custom; and (4) gross negligence in managing subordinates who have caused the violation." *Patterson v. Lilley,* No. 02CV6056, 2003 WL 21507345, at *6 (S.D.N.Y. June 30, 2003).

Here, the plaintiff does not assert personal involvement of Sheriff Reilly, but contends that he wrote a letter to the Sheriff complaining of his medical treatment. (Tr. Hearing at 132:1–4). However, the only correspondence to the Sheriff's Office in evidence is a letter dated May 27, 2003 addressed to Undersheriff Ralph Smith. This evidence is insufficient to establish Sheriff Reilly's personal knowledge of the plaintiff's complaints. *See Bumpus,* 495 F.Supp.2d at 322–23 (finding that inmate's deposition testimony that he wrote several letters to nurse administrator was insufficient to establish her personal liability); *Brooks v. Chappius,* 450 F.Supp.2d 220, 226 (W.D.N.Y.2006) ("Even the fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement" (internal quotations and citations omitted)); *see also Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("The plaintiff's claim for monetary damages against [a prison official] requires a showing of more than linkage in the prison chain of command.")

Further, the plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment. Accordingly, the plaintiff's claims against Sheriff Reilly in his individual capacity are dismissed.

However, the Court finds that the plaintiff has raised a genuine issue of material fact as to whether Dr. James Neal, the Medical Director charged with oversight of the health care provided to NCCC inmates, was involved in either the creation of an unconstitutional practice or custom or exhibited gross negligence in supervising subordinates who were responsible for failing to provide medical care and prescription medication to the plaintiff.

### C. As to the Plaintiff's Claims Against the County of Nassau

A suit against a municipal official in his official capacity for monetary damages is in effect a suit against the municipality itself. *Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.1993). While the complaint does not explicitly state that Sheriff Reilly is sued in his official capacity, the plaintiff argues in opposition to defendants' motion that the County is liable for violating his Eighth Amendment rights. For the purposes of this motion, the Court will consider the plaintiff's claims against the County. *Id.* ("[A] plaintiff who has not clearly identified in her complaint the capacity in which the defendant is sued should not have the complaint automatically construed as focusing on one capacity to the exclusion of the other.")

Municipal liability under Section 1983 cannot be based on a theory of *respondeat superior. See Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 404–05, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Jeffes v. Barnes,* 208 F.3d 49, 56–57 (2d Cir.2000); *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir.1988). Rather, the plaintiff must show that the constitutional violation by a municipal employee resulted from a custom, policy, or practice of the municipality. *See Monell,* 436 U.S. at 694, 98 S.Ct. 2018; *DeCarlo,* 141 F.3d at 61; *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995).

" "The mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circum-

stantially, such an inference.'" *Snall v. City of New York*, 242 F.3d 367, 2000 WL 1847664, at *4 (2d Cir.2000) (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir.1993)). The plaintiff must produce "'some evidence that policymakers were aware of a pattern of [unconstitutional conduct] but failed to [respond].'" *Davis v. Lynbrook Police Dep't*, 224 F.Supp.2d 463, 478 (E.D.N.Y.2002) (quoting *Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir.1992)). In addition, an official policy, practice or custom cannot be inferred from a single incident alleged in a complaint against a municipal employee not vested with policy-making authority. *See Dwares*, 985 F.2d at 100.

■ The plaintiff alleges that the informal grievance policy effectively muted the pleas of NCCC inmates when they sought assistant for lack of proper medical care. However, as noted above, there is no constitutional right to a grievance procedure and the informal grievance policy is not at the heart of this matter. Instead the pertinent policy or custom involved in this action would concern the denial of medication and medical care to either the inmate population in general or to the plaintiff in particular.

■ The existence of a municipal policy or custom, may be plead in four ways. The plaintiff may establish:

(1) the existence of a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision-making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to deliberate indif-

ference to the rights of those who come in contact with municipal employees.

*Bonds v. Suffolk County Sheriff's Dept.*, No. 05CV3109, 2006 WL 3681206 (E.D.N.Y. Dec. 5, 2006).

The plaintiff fails to produce any evidence of a municipal policy or custom resulting in the deprivation of inmate medical attention and the plaintiff did not offer any relevant deposition testimony regarding a policy or custom. The plaintiff was given a full opportunity to conduct discovery in connection with these claims and failed to do so. Further, the plaintiff has not alleged that other inmates experienced problems similar to his. Absent production of any competent evidence in this regard, the plaintiff's Section 1983 claim against Sheriff Reilly in his official capacity must be dismissed.

*D. Causation*

The defendants spend much time urging the Court to disregard the plaintiff's submission of an affirmation of his treating physician, Dr. Michael Ammazzalorso, M.D., which provides, in sum, that "the progression of illness and consequent injuries sustained by Mr. Mastroianni, are causally related to the actions and treatment provided during the period he was under the care of the Nassau County Corrections Center." (Aff. of Michael Ammazzalorso, May 21, 2008, at 3). Thus, Dr. Ammazzalorso's affirmation addresses the issue of whether the plaintiff sustained an compensable injury as a direct result of the alleged constitutional violation. This question need not be answered for purposes of the present motion.

■ The plaintiff is not required to establish an actual physical injury caused by the alleged lack of medical care to prevail in this action. If inadequate medical care created a serious risk of harm and

rose to a violation of the plaintiff's civil rights, he is entitled to recover nominal damages even if the plaintiff sustained no injury. *LaBounty v. Rivera*, No. 95CV2617, 1999 WL 1129063, at *7 (S.D.N.Y. Dec. 8, 1999) ("When a jury finds a constitutional violation but determines that there is no injury entitling the plaintiff to compensatory damages, a plaintiff is entitled to nominal damages, usually in the amount of $1.00.") (citing *Robinson v. Cattaraugus County*, 147 F.3d 153, 162 (2d Cir.1998)). Further, "an award of nominal damages allows the jury to award punitive damages." *LaBounty*, 1999 WL 1129063, at *7; *see also Richardson v. Nassau County*, 277 F.Supp.2d 196, 202 (E.D.N.Y.2003) (noting that a plaintiff alleging medical indifference pursuant to Section 1983 need not produce expert medical testimony).

The Court is unwilling to rule at this time that the plaintiff will be unable to establish at the trial an actual injury proximately caused by the acts of the defendants. As the plaintiff has presented evidence sufficient to survive summary judgment, the issue of whether expert medical evidence should be excluded for failure to comply with the rules of discovery will be considered on a motion *in limine* in advance of the trial.

## III. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED,** that the motion for summary judgment dismissing the plaintiff's claims against Dr. Minetti is granted; and it is further

**ORDERED,** that the motion for summary judgment dismissing the plaintiff's claims against Sheriff Edward Reilly in his individual and official capacities is granted; and it is further

**ORDERED,** that the motion for summary judgment dismissing the plaintiff's claims against Dr. James Neal in his individual capacity is granted with respect to the plaintiff's claims concerning his diet and diabetic condition, the treatment of his back injury, and the treatment of his kidney stone condition; and is denied with respect to the plaintiff's claims concerning his requests for cardiac testing and the missed doses of his medications; and it is further

**ORDERED,** that the parties are directed to appear for a pre-trial conference and to set a date for jury selection in this matter on Tuesday, March 17, 2009 at 9 am in courtroom 1020; and it is further

**ORDERED,** that the caption is amended as follows:

ERNEST E. MASTROIANNI, Plaintiff,

—against—

JAMES NEAL, Defendant.

**SO ORDERED.**